CHRIS D. KUHNER, ESQ. (Bar No. 173291)
**KORNFIELD, NYBERG, BENDES, KUHNER & LITTLE P.C.**
1970 Broadway, Suite 600
Oakland, California 94612
Telephone: (510) 763-1000
Facsimile: (510) 273-8669
Email: c.kuhner@kornfieldlaw.com

Proposed Attorneys for Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 24-51678 MEH |
| PRECISION SWISS PRODUCTS, INC., | Chapter 11 |
| | **DECLARATION OF NORBERT KOZAR IN SUPPORT OF MOTION FOR (1) APPROVAL OF ASSET PURCHASE AGREEMENT SALE OF ASSETS PURSUANT TO 11 U.S.C. SECTION 363; AND (2) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. SECTION 365** |
| Debtor. | |

Date: December 12, 2024
Time: 11:30 a.m.
Ctrm: 10
U.S. Bankruptcy Court
280 South First Street, 3rd Fl.
San Jose, CA 95113

I, Norbert Kozar, declare as follows:

1.      I am the President of Precision Swiss Products, Inc. (the "Debtor" or "PSP"). I have served as the Debtor's President from 2007 to the present. I am knowledgeable and familiar with the Debtor's day-to-day operations, business, and financial affairs, and the circumstances leading to the commencement of the Debtor's Chapter 11 bankruptcy case.

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 1 of 51

2. I know the following of my own personal knowledge, except as otherwise indicated herein, and I can competently testify thereto if called upon to do so.

3. This declaration is submitted in support of the Motion for (1) Approval of Asset Purchase Agreement Sale of Assets Pursuant to 11 U.S.C. Section 363; and (2) Assumption and Assignment of Executory Contracts Pursuant to 11 U.S.C. Section 365 (the "Motion").

## I. Background, Pre-Petition Events and Proposed Sale and Debtor in Possession Financing

4. The Debtor is a privately held California corporation which specializes in the manufacturing and selling highly specialized components and assemblies equipment for medical, semiconductor, aviation and defense companies. The Debtor is a leader in innovative, precision manufacturing solutions for customers across a variety of industries including medical devices, aerospace and defense, and semiconductors. As a highly automated manufacturer focused on producing close tolerance components within accelerated time frames, the Debtor maintains essential industry standard certifications, including ISO 13485, ISO 9001, and AS9100D. State-of-the-art, multi-axis manufacturing equipment helps to guarantee customers' requirements, and specifications are met with a focus on reducing costs and time to market. Moreover, the Debtor's in-house engineering staff takes a consultative approach with customers to ensure exact specifications are met. With its experienced management team, skilled workforce, industry-leading machinery, and attractive customer relationships, the Debtor is competitively positioned within its niche.

5. After realizing tremendous year-over-year growth and reaching capacity in its Milpitas, California-based facility in 2020, the Company executed its strategic plan to expand its footprint with a new facility in North Carolina and made a significant investment in equipment the following year. Unfortunately, in late 2022, the semiconductor industry faced significant disruption due to the Covid-19 pandemic, severely impacting the Company's financial performance. As a result, the Company experienced a significant revenue decline in 2023 and had to forego several new business opportunities in the aerospace sector due to insufficient working capital. Through development and investment, the Debtor has significant "back log" of profitable and long terms

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 2 of 51

KORNFIELD NYBERG, BENDES, KUHNER & LITTLE, P.C.
1970 Broadway, Suite 600   Oakland, California 94612

projects that, if the Debtor was able to see through completion, would provide significant net profit and likely resolve the Debtor's financial crisis.

6. Although the Debtor has been operating to fulfill all its obligations to its customers, it has financed operations through high interest unsecured loans, merchant customer advances aka "MCAs," delaying and in some case stopping payments to vendors, equipment lessors and its North Carolina landlord, as well as a significant amount of unpaid payroll taxes. This has resulted in a significant amount of creditor pressure, including the refusal to ship material on credit, the filing of over a dozen lawsuits by vendors, equipment lenders/lessors and the Debtor's North Carolina landlord all pending in California, North Carolina, New Jersey and Illinois. Many of these obligations are personally guaranteed by the owners and officers of the Debtor.

7. Although the debt structure of the Debtor is not sustainable long term, the Debtor represents an opportunity for a buyer to acquire a differentiated precision manufacturer and bypass regulatory and contractual barriers to entry, resulting in immediate access to attractive relationships with established customers in the industries served with the ability to scale the business quickly. Absent a sale of the Debtor's business through a chapter 11 bankruptcy, the Debtor was facing a chapter 7 bankruptcy which would result in: (1) sixty seven (67) employees losing their jobs; (2) existing customer orders not being completed triggering significant damage to their operations; (3) the account receivables becoming uncollectable due to the Debtor's breach; and (4) senior lender foreclosing on the Debtor's assets; (5) no payments to junior secured creditors let alone unsecured creditors; and (6) chaos relating to the equipment lenders/lessors recovering and/or foreclosing on the Debtor high end, sensitive equipment that will plummet in value if not serviced on an ongoing basis. To avoid shut down, the only option is to find a buyer and sell the Debtor's business as a going concern.

8. In the spring of 2024, the Debtor began discussing the possible sale of its business with ERA Parent, LP, d/b/a BTX Precision ("BTX"), a Delaware limited liability partnership operating in the same market space as the Debtor. BTX showed interest in acquiring the Debtor, but no definitive acquisition agreement was executed, primarily due to the Debtor over leveraged

KORNFIELD
NYBERG, BENDES, KUHNER & LITTLE, P.C.
1970 Broadway, Suite 600   Oakland, California 94612

balance sheet and the number of unsecured and under secured creditors making any such transaction difficult, if not possible, outside of a chapter 11 bankruptcy. On October 1, 2024, the Debtor retained SC&H Group ("SC&H") as its investment banker-financial adviser to advise the Debtor regarding the sale of the Debtor's business. The Debtor and ERA Parent, LP d/b/a BTX Precision ("BTX") have entered into a letter of intent to acquire the Debtor assets and business for $5,000,000 subject to an overbid and auction process to be run through this bankruptcy on a very short timeline—45-60 days ("BTX LOI"). The Debtor and BTX are negotiating a comprehensive asset purchase agreement ("APA") consistent with the BTX LOI to be signed prior to noticing out any sale, a copy of which is attached hereto as **Exhibit A**. BTX was also willing to provide the Debtor with debtor in possession financing up to $500,000 to fund the bankruptcy process. This proposed debtor in possession financing from BTX required that the loan be in a senior lien position on the Debtor's inventory, account receivables which would require consent from the Debtor's senior lender, Gateway Acceptance Company ("Gateway"), Gateway was unwilling to consent to be primed and the risk the court would not authorize post-petition lending over the objection of Gateway was something the Debtor wanted to avoid. Therefore, the Debtor began negotiating with Gateway to provide access to financing to bridge the gap in its revenue to allow it to complete its sale process through this bankruptcy. Those discussions have resulted in an agreement with Gateway to provide post-petition financing which, along with the Debtor's revenue, will provide the necessary revenue and loan proceeds to fund operations and the sale process in this bankruptcy case.

9.     Gateway has agreed to provide the Debtor debtor-in-possession financing which includes two buckets of lending: (1) a loan the Deboor $100,000 for working capital ("Working Capital Loan") and (2) Gateway has also agreed to increase the percentage of Account Advances from the current sixty percent (60%) to eighty percent (80%) net face value of the account receivable ("Factor Financing"). The Court entered an order approving the Post Petition Financing on an interim basis on November 7, 2024 [Docket #23].

## II.     The Current Debt Structure of The Debtor

10.    As set forth above, the Debtor has significant unsustainable unsecured debt, secured

Case: 24-51678    Doc# 43    Filed: 11/14/24    Entered: 11/14/24 15:43:07    Page 4 of 51

debt and obligations to equipment lenders/lessors. The break down is follows:

    a.   Secured Debt:(1) Gateway $3,709,954 (senior lien secured by certain factored receivables and a blanket lien on all the Debtor's assets); (2) U.S. Small Business Administration $1,979,751 (junior lien secured by all of the Debtor's assets; (3) MCA lenders $178,000 (est) (junior liens secured by all the Debtor's assets; and (4) Santa Clara County Tax Collector $66,777 (priority unknown).

    b.   Lease/Loans Secured by Equipment: $6,923,578

    c.   Unsecured Priority Debt: $1,379,813

    d.   Unsecured Non Priority Debt: $7,938,071

11. In addition, the Debtor owes the North Carolina Landlord, International Commerce Center, LLC ("NC Landlord") past due rent in the amount of approximately $300,000 and the NC Landlord has filed proceedings in North Carolina to remove the Debtor from the facilities. The matter is set for hearing November 12, 2024. The Debtor through counsel has been in discussions with counsel for the NC Landlord regarding assuming the lease or potential re negotiating the lease with any new owner of the Debtor. The lease with the Milpitas location is current and the Debtor is operating under an agreement to vacate the space before April 2025 in exchange for not paying rent through that date.

12. It is anticipated that myself and the Debtor's Controller, Melissa Kozar, will be retained by BTX as employees if they are the successful purchaser of the assets of the Debtor. Prior to the filing of this bankruptcy case, I did have conversations with BTX in April of 2024 about selling the Debtor to BTX, but those discussions did not result in any definitive legal agreement being agreed to by the parties. I remained in contact with BTX and ultimately entered into the BTX LOI and am working with my advisors to complete the negotiations regarding to the APA.

13. My current compensation is $45,760 a year and Melissa Kozar's compensation is $274,940 a year. It is anticipated that both myself and Ms. Kozar will be retained as employees by BTX but there terms of any employment have yet to be finalized. The terms of any employment

KORNFIELD NYBERG, BENDES, KUHNER & LITTLE, P.C.

1970 Broadway, Suite 600  Oakland, California 94612

Declaration of Norbert Kozar

-5-

Case: 24-51678    Doc# 43    Filed: 11/14/24    Entered: 11/14/24 15:43:07    Page 5 of 51

1  will be included in the declarations to support of a good faith finding as to BTX.

2  I declare under penalty of perjury that the foregoing is true and correct and that this

3  declaration was executed this 14th day of November, 2024 at Milpitas, California.

5  /s/ Norbert Kozar

6  Norbert Kozar

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**dated as of**

**November 14, 2024,**

**by and among**

**BTX PRECISION LLC,**

**PRECISION SWISS PRODUCTS, INC.,**

**and, for purposes of Section 3.5 hereof,**

**NORBERT KOZAR and MELISSA KOZAR**

# TABLE OF CONTENTS

ARTICLE I          SALE AND PURCHASE OF ASSETS; CLOSING ...................................... 1

1.1     Certain Terms............................................................................................ 1
1.2     Sale and Purchase of Purchased Assets; Assumption of Certain Liabilities ........ 1
1.3     Deposit and Purchase Price...................................................................... 6
1.4     The Closing ............................................................................................. 6
1.5     Closing Deliveries ................................................................................... 6
1.6     Assumption of Assumed Contracts at Closing ......................................... 7
1.7     Withholding ............................................................................................ 8

ARTICLE II         CERTAIN COVENANTS .............................................................. 8

2.1     Conduct of Business Prior to the Closing ................................................ 8
2.2     Access to Information .............................................................................. 9
2.3     Notice of Certain Events ......................................................................... 9
2.4     Tax Matters ........................................................................................... 10
2.5     Bulk Transfer Laws................................................................................ 10
2.6     Employees ............................................................................................. 11
2.7     Reasonable Best Efforts ........................................................................ 11
2.8     Nonassignable Contracts ....................................................................... 11

ARTICLE III        CERTAIN ADDITIONAL COVENANTS .................................. 12

3.1     Tax Covenants ...................................................................................... 12
3.2     Retained Assets; Certain Transitional Matters ...................................... 13
3.3     Protections for Payment of Bid Protections........................................... 13
3.4     Name Change ........................................................................................ 13
Transition Services.......................................................................................... 13

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER ....................... 14

4.1     Organization, Good Standing and Qualification.................................... 14
4.2     No Subsidiaries ..................................................................................... 14
4.3     Authorization; Enforceability ............................................................... 14
4.4     No Conflict............................................................................................ 14
4.5     Governmental Authorities; Consents .................................................... 15
4.6     Legal Compliance ................................................................................. 15
4.7     Licenses, Permits, Orders and Authorizations...................................... 15
4.8     Litigation............................................................................................... 15
4.9     Title to, and Nature of, Assets .............................................................. 15
4.10   Material Adverse Change ...................................................................... 15
4.11   Intellectual Property ............................................................................. 15
4.12   Notes and Accounts Receivable............................................................ 16
4.13   Assumed Contracts ............................................................................... 16
4.14   Inventories............................................................................................. 16
4.15   Employees; Labor Agreements and Actions; Benefit Plans ................. 16
4.16   Taxes ..................................................................................................... 17
4.17   Brokers' Fees ........................................................................................ 17

Case: 24-51678    Doc# 43    Filed: 11/14/24    Entered: 11/14/24 15:43:07    Page 9 of 51

ARTICLE V  REPRESENTATIONS AND WARRANTIES OF BUYER ......................... 17

 5.1 Organization and Good Standing ................................................................. 17
 5.2 Authorization; Enforceability ..................................................................... 17
 5.3 No Conflict ................................................................................................... 18
 5.4 Governmental Authorities; Consents .......................................................... 18
 5.5 Certain Proceedings .................................................................................... 18

ARTICLE VI  CONDITIONS TO CLOSING ............................................. 18

 6.1 Conditions to Obligations of Buyer ............................................................ 18
 6.2 Conditions to Obligations of Seller ............................................................ 19

ARTICLE VII  METHOD OF SALE; BANKRUPTCY PROVISIONS ............................. 20

 7.1 Sale Motion ................................................................................................. 20
 7.2 Sale Procedures Order ................................................................................. 20
 7.3 Competing Bids ........................................................................................... 20
 7.4 Receipt of Qualifying Offers ....................................................................... 21
 7.5 Qualifying Offers ........................................................................................ 21
 7.6 Bid Protection ............................................................................................. 21
 7.7 Further Bids ................................................................................................. 21
 7.8 Confidentiality ............................................................................................ 22
 7.9 Break-Up Fee and Expense Reimbursement .............................................. 22
 7.10 Bankruptcy Court Filings ............................................................................ 23

ARTICLE VIII  TERMINATION .................................................................. 24

 8.1 Termination Events ..................................................................................... 24
 8.2 Notice of Termination .................................................................................. 25
 8.3 Effect of Termination .................................................................................. 25

ARTICLE IX  DEFINITIONS ....................................................................... 26

 9.1 Certain Definitions ...................................................................................... 26

ARTICLE X  MISCELLANEOUS .............................................................. 34

 10.1 Expenses ...................................................................................................... 34
 10.2 Press Releases and Public Announcements ................................................ 34
 10.3 No Third-Party Beneficiaries ...................................................................... 34
 10.4 Notices ......................................................................................................... 35
 10.5 Further Assurances ...................................................................................... 36
 10.6 Amendments and Waivers ........................................................................... 36
 10.7 Entire Agreement ........................................................................................ 36
 10.8 Assignments, Successors and No Third-Party Rights ................................. 36
 10.9 Severability .................................................................................................. 37
 10.10 Headings; Construction ............................................................................... 37
 10.11 Governing Law ............................................................................................ 38

Case: 24-51678  Doc# 43  Filed: 11/14/24  Entered: 11/14/24 15:43:07  Page 10 of 51

10.12  Dispute Resolution; Consent to Jurisdiction .......................................................... 38
10.13  Counterparts; Facsimile ........................................................................................... 39
10.14  Specific Performance ............................................................................................... 39

**TABLE OF EXHIBITS**

**EXHIBIT A   Assumed Contracts**
**EXHIBIT B   Assignment and Assumption Agreement**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of November 14, 2024 (the "Effective Date"), by and among (i) BTX Precision LLC, a Delaware limited liability company ("Buyer"); (ii) Precision Swiss Products, Inc., a California corporation ("Seller"); and (iii) for purposes of Section 3.5 hereof, Norbert Kozar and Melissa Kozar.  Buyer and Seller are referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

A.      Seller is in the business of manufacturing and selling highly specialized components and assembly equipment for medical, semiconductor, aviation and defense companies, together with ancillary services and products related to the foregoing (the "Business").

B.      On the terms and subject to the conditions of this Agreement, Seller wishes to sell, and Buyer wishes to purchase, substantially all of the Purchased Assets of Seller used or held for use in the Business subject only to the assumption of certain specified Liabilities of Seller, in each case upon the terms and subject to the conditions set forth in this Agreement and the other Transaction Documents (the "Transactions").

C.      Buyer acknowledges this Agreement constitutes a stalking horse bid for the acquisition of the Purchased Assets as part of a sale process to take place in connection with a case for reorganization under chapter 11 of the Bankruptcy Code (the "Bankruptcy Code"), filed on November 4, 2024 (the "Filing Date") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), designated as Case No. 24-51678 (the "Chapter 11 Case").  Buyer further acknowledges that Seller may seek offers in one or more lots for the Assets, but the aggregate of all such bids must meet or exceed the Purchase Price plus the Bid Protection to constitute a higher and better offer than the Purchase Price set forth in this Agreement, or as may be increased at the Auction.

## AGREEMENT

The Parties, intending to be legally bound, in consideration of the mutual covenants contained herein, hereby agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF ASSETS; CLOSING

1.1      Certain Terms.  Certain capitalized terms used in this Agreement are defined herein or otherwise defined in Article IX.

1.2      Sale and Purchase of Purchased Assets; Assumption of Certain Liabilities.

(a)      Purchased Assets.  Subject to the terms and conditions of this Agreement, and to the approval of the Bankruptcy Court, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, free and clear of all Encumbrances, all of Seller's, right, title and interest in and to all of the Assets of Seller used, useful or held for use in the Business, other than the Excluded Assets (all of such purchased assets being collectively

referred to as "Purchased Assets").  Without limiting the generality of the foregoing, the Purchased Assets shall include all of the following existing on the Closing Date:

(i)     all goodwill of Seller as a going concern, including all goodwill relating to the Business;

(ii)     all Accounts Receivable;

(iii)     all Inventories, including work in progress;

(iv)     all Tangible Personal Property;

(v)     all Contracts other than the Excluded Contracts;

(vi)     all Permits;

(vii)     all of Seller's books and records relating to the Business, the Purchased Assets, the Employees and the Assumed Liabilities (including Tax Returns and Tax-related information relating to the Business, the Purchased Assets or the Assumed Liabilities and, except as prohibited by applicable Law, personnel files for Employees; provided, however, that Seller has the right to retain copies of such personnel files (at Seller's expense) to the extent required by Law);

(viii)     all of the Intellectual Property Assets of Seller, including, without limitation, all rights relating to Software, patents, Trade Secrets and all rights relating to the name "Precision Swiss Products" all names, letters, marks, logos or symbols associated with the Business used by Seller or the Business or any other names, letters, marks, logos or symbols which are used with respect to the products or services provided or offered by Seller or the Business, telephone numbers, domain names, social media handles, all email addresses utilizing such domain names, and the websites www.precisionswiss.com, www.precisionswiss.de, www.precisionswiss.at, www.nanoscrew.net, www.nanoscrew.info, and any variations of the foregoing;

(ix)     all of the right, title and interest of Seller in and to those certain executory Contracts and unexpired leases, if any, selected by Buyer, in its sole and absolute discretion (collectively, the "Assumed Contracts");

(x)     all claims of Seller against third parties relating to the Purchased Assets or the Assumed Liabilities, whether known or unknown, fixed or contingent;

(xi)     all work-in-process, including the right to payment from customers relating to the same;

(xii)     all claims, deposits, prepayments, prepaid expenses, warranties, guaranties, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature;

2

(xiii)   all telephone numbers, telecopy numbers and e-mail addresses and listings used in the Business;

(xiv)   all warranty and condemnation net proceeds received with respect to damage, non-conformance of or loss to the Purchased Assets;

(xv)   copies of all customer and supplier lists (whether past or current), customer and supplier records, invoices and all books, records and accounts, financial records, manuals, studies, reports or summaries and sales and promotional literature, in each case, whether in written or electronic format;

(xvi)   all rights to receive and retain mail and other communications relating to the Purchased Assets and the Assumed Liabilities after the Closing;

(xvii)   all rights to receive any insurance proceeds payable in respect of the Business or any Purchased Asset;

(xviii)  bank accounts of Seller used in the Business; and

(xix)   all other Assets of every kind, nature and description, tangible or intangible, owned by Seller and used or held for use in connection with the Business, but excluding the Excluded Assets.

(b)   <u>Excluded Assets</u>.   Notwithstanding any other provision of this Agreement to the contrary, the following Assets of Seller existing on the Closing Date (collectively, the "<u>Excluded Assets</u>") are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets and shall remain the property of Seller after the Closing:

(i)   all minute books, corporate seals, stock record books and stock transfer records of Seller and Income Tax Returns and Income Tax records of Seller and records pertaining to the Excluded Assets and the Excluded Liabilities;

(ii)   all cash of Seller;

(iii)   all Contracts not listed on <u>Exhibit A</u>   (the "<u>Excluded Contracts</u>");

(iv)   the Assets expressly designated in <u>Schedule 1.2(b)(iv)</u> of the Disclosure Schedule;

(v)   with the exception of any causes of action directly related to the Purchased Assets, all causes of action and litigation rights existing as of the Closing in favor of Seller, including any and all causes of action arising under Sections 510, 544-553 of the United States Bankruptcy Code;

(vi)   all rights of Seller under executory Contracts and unexpired leases that are not Assumed Contracts;

3

(vii)    all insurance policies of Seller; and

(viii)    all claims of Seller against third parties relating to the Excluded Assets or Excluded Liabilities, whether known or unknown, fixed or contingent.

(c)    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order, at the Closing, Buyer shall assume only Liabilities arising after the Closing Date under the Assumed Contracts relating to performance on or after the Closing Date, except for Liabilities caused by a breach by Seller of its obligations under such Contracts occurring on or prior to the Closing Date (the "<u>Assumed Liabilities</u>"); provided, however, such Assumed Liabilities shall not include any Cure Costs.

Except as expressly provided in this Agreement and the Assignment and Assumption Agreement, Buyer shall not assume or be liable, nor be deemed to have assumed or be liable for, any Liability of Seller of any nature whatsoever, including without limitation, any of the Excluded Liabilities.

(d)    <u>Excluded Liabilities</u>.  The Excluded Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller.  "<u>Excluded Liabilities</u>" means all liabilities not expressly included as Assumed Liabilities and includes, without limitation, the following Liabilities:

(i)    any Liability arising out of or relating to services or products of Seller to the extent performed or sold prior to the Closing Date;

(ii)    any Liability with respect to executory Contracts and unexpired leases which are not Assumed Contracts;

(iii)    any Liability under any Assumed Contract for injury to person or property, for repairs or replacements, under a warranty or for noncompliance with any Law arising out of or relating to any occurrence or event happening on or prior to the Closing Date;

(iv)    any Liability under any Assumed Contract assumed by Buyer pursuant to <u>Section 1.2(c)</u> that arises on or after the Closing Date but that arises out of or relates to any breach by Seller of its obligations under such Assumed Contract that occurred prior to the Closing Date;

(v)    any Liability for (A) any Taxes or liabilities arising from the failure to comply with or obtain a certificate under any Bulk Sales Laws (including in respect of the Transactions), (B) any and all Taxes (irrespective of when asserted) of Seller, for any taxable period (including any such Taxes or related liabilities that may be imposed on or asserted against Buyer or any of its Affiliates as a transferee or successor as a result of the Transactions), (C) any Taxes related to or arising from any of the Purchased Assets, any of the Assumed Liabilities or the Business, in each case, for any taxable period (or portion thereof) ending on or before the Closing Date (including any Taxes of or required Tax withholdings relating to the misclassification of any service provider as an independent contractor rather than an employee for tax purposes), (D) any Taxes that will arise as a result of the sale of the Purchased Assets pursuant to this Agreement, (E) Transfer Taxes and any Taxes allocable to Seller under <u>Section 3.1</u> and (F) any deferred Taxes of any nature;

4

(vi)     any Liability for or in respect of any rebates or similar payments to customers arising out of or related to any period prior to the Closing Date;

(vii)     any Environmental Liabilities arising out of or relating to ownership or operation of the real property or the Business, or any time period, occurrence or event happening on or prior to the Closing Date;

(viii)     any Liability for any employee benefits plan, benefits, compensation or bonus of any kind (whether accrued or unaccrued) for Seller's employees and former employees (or their respective dependents), and including, without limitation, as a result of any non-compliance with any Law (including, without limitation, the Fair Labor Standards Act or the WARN Act);

(ix)     any Liability under any employment, severance, retention or termination agreement with employees of Seller or any of its Affiliates;

(x)     any Liability arising out of any employee grievance related to the period prior to the Closing Date (regardless of when asserted) whether or not the employee is hired by Buyer;

(xi)     any Liability to any equityholder of Seller or any Affiliate of Seller or any equityholder of Seller;

(xii)     any Liability to indemnify, reimburse or advance amounts to or arising from any guarantee of Seller for the benefit of any officer, director, employee or agent of Seller;

(xiii)     any Liability to distribute to any equityholder of Seller, or otherwise apply, all or part of the consideration received hereunder;

(xiv)     any Liability arising out of any Proceeding pending as of the Closing Date or any Proceeding commenced on or after the Closing Date and arising out of or relating to any occurrence or event happening prior to the Closing Date;

(xv)     any Liability arising out of or resulting from Seller's compliance or noncompliance with any Law or Order of any Governmental Authority;

(xvi)     any Liability with respect to Indebtedness;

(xvii)     all Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Transaction Documents and the Transactions, including fees and expenses of counsel, accountants, consultants, advisers and others; and

(xviii)     any Liability arising, existing or occurring before the Closing Date.

5

1.3     Deposit and Purchase Price.

(a)     **Deposit**.  Within two (2) Business Days following the Effective Date, Buyer shall deposit Five Hundred Thousand and 00/100 Dollars ($500,000.00) in an interest-bearing account with an escrow agent reasonably acceptable to Buyer with interest payable to Buyer, to be disbursed only upon Order of the Bankruptcy Court (the "Deposit"). The Deposit shall be credited to Buyer against the Purchase Price at the Closing (as defined below) or returned to Buyer as provided herein.

(b)     **Purchase Price**. The aggregate purchase price for the Purchased Assets shall be an amount equal to:

(i)     Five Million and 00/100 Dollars ($5,000,000); plus

(ii)     the assumption of the Assumed Liabilities (the sum of clauses (i) through (ii), the "Purchase Price").

Purchaser reserves the right to increase the Purchase Price at the Auction as provided in the Sale Procedures Order.  Buyer shall not have any liability with respect to the allocation of the Purchase Price or any other amounts payable by Buyer hereunder to Seller.

1.4     The Closing. In the event that Buyer is the Prevailing Bidder with respect to the Purchased Assets, and this Agreement is approved as the Prevailing Bid by order of the Bankruptcy Court at the Sale Hearing (the "Sale Approval Order"), then the closing of the Transactions (the "Closing") shall take place remotely via the electronic exchange of closing deliveries on the first Business Day of the month to occur following the date that is the later of (i) December 27, 2024, and (ii) five (5) Business Days after the date on which the last of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing) has been satisfied or, to the extent permissible, waived by the Party or Parties entitled to the benefit thereof (provided, that if the Outside Date shall fall during such five (5) Business Day period, it shall automatically be extended until the next Business Day following such five (5) Business Day period, it being understood and agreed by the Parties hereto that in no event shall the Outside Date be extended by more than five (5) Business Days, or on such other date or at such other location as the Parties may mutually agree).  The date of the Closing is referred to herein as the "Closing Date."

1.5     Closing Deliveries.

(a)     At or prior to the Closing, Seller shall deliver or cause to be delivered to Buyer:

(i)     a certified copy of the Sale Approval Order;

(ii)     originals of the Assumed Contracts, and if unavailable, true and correct copies thereof;

(iii)     the Purchased Assets;

6

(iv)     an Assignment and Assumption Agreement dated the Closing Date and duly executed by Seller;

(v)     such other bills of sale, assignments, deeds, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance reasonably satisfactory to Buyer dated the Closing Date and duly executed by Seller;

(vi)     a restrictive covenant agreement, in form and substance acceptable to Buyer, dated as of the Closing Date, by and between Buyer and each of Norbert Kozar and Melissa Kozar, duly executed by each of Norbert Kozar and Melissa Kozar (the "RCAs");

(vii)     a certificate, dated as of the Closing Date and executed by a duly authorized officer of Seller, certifying to the fulfillment of the conditions specified in Sections 6.1(a), 6.1(e) and 6.1(e); and

(viii)     such other documents as Buyer may reasonably request to effect the Transactions.

(b)     At or prior to the Closing, Buyer shall deliver:

(i)     to Seller, an amount equal to the Purchase Price (less the Deposit already tendered);

(ii)     the Assignment and Assumption Agreement dated the Closing Date and duly executed by Buyer;

(iii)     the RCAs, duly executed by Buyer; and

(iv)     such other documents as Seller may reasonably request to effect the Transactions.

1.6     Assumption of Assumed Contracts at Closing.

(a)     On or before the Initial Bid Deadline, Buyer shall provide Seller a list of unexpired leases and executory Contracts Buyer desires Seller to assume and assign to Buyer, which shall be set forth in Exhibit A attached hereto and made a part hereof, to be assumed by the Buyer at Closing subject approval by the Bankruptcy Court.

(b)     Seller shall take all actions required to assume and assign the Assumed Contracts to Buyer in the Chapter 11 Case, including (i) taking all actions required to facilitate any negotiations with the counterparties to such Contracts and leases (including between and among all such counterparties and Buyer) and obtaining an order from the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code; and (ii) expressly authorizing the assumption and assignment of the Assumed Contracts.

7

(c)     At Closing, (i) Seller shall assume and assign to Buyer each of the Assumed Contracts that is capable of being assumed and assigned and (ii) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts pursuant to the entry of an order by the Bankruptcy Court, approving the assumption and assignment of the Assumed Contracts (the "Executory Contract Approval Order"). The Executory Contract Approval Order shall expressly provide that Seller shall bear all costs necessary to remedy any existing defaults under the Assumed Contracts (the "Cure Costs").

(d)     Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time prior to a date which is five (5) Business Days prior to the Closing Date, and in its sole discretion, upon written notice to the Seller, amend or revise Exhibit A to eliminate any Assumed Contract therefrom or to add any Contract thereto, so long as, in each case, the Seller (x) is a party or third-party beneficiary to such Contract and (y) each such Contract relates to the Purchased Assets. Automatically upon such addition of any Contract by Buyer in accordance with the previous sentence, such Contract shall be an Assumed Contract for all purposes of this Agreement. Automatically upon any such deletion of any Assumed Contract by Buyer in accordance with the first sentence of this Section 1.6(d), such Contract shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer or be the obligation, Liability or responsibility of Buyer, in each case, until and unless such time, if any, as Buyer restores such eliminated Contract to Exhibit A in accordance with the first sentence of this Section 1.6(d). If any Contract is added to the list of Assumed Contracts, then the Seller shall take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing.

1.7     Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer will be entitled to deduct and withhold from any amounts payable or otherwise deliverable pursuant to this Agreement any Taxes or other amounts required to be deducted or withheld therefrom under the Code or any applicable Law. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

## ARTICLE II
## CERTAIN COVENANTS

2.1     Conduct of Business Prior to the Closing. From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (x) conduct the Business in the Ordinary Course of Business consistent with past practice; (y) use reasonable best efforts to maintain and preserve intact its current Business organization and operations and to preserve the rights, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business, and (z) confer with Buyer concerning operational matters of a material nature that would reasonably be expected to cause a breach of any representation or warranty contained in Article IV and report immediately to Buyer any material adverse event concerning its business, the Purchased Assets, the Assumed Liabilities, operations, financial condition or prospects. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

8

(a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of the Business and file Tax Returns and applicable extensions when due; provided, however, Seller shall be obligated to pay such taxes only to the extent authorized under the Bankruptcy Code;

(c)    continue to collect Accounts Receivable in a manner consistent with past practice;

(d)    maintain the real property and other properties and Assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(e)    continue in full force and effect without modification all insurance policies, except as required by applicable Law;

(f)    defend and protect the real property and other the properties and Assets included in the Purchased Assets from infringement or usurpation;

(g)    maintain the books and records of the Business in accordance with past practice;

(h)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership or use of the Purchased Assets; and

(i)    not take or permit any action that would cause any of the changes, events or conditions described in this <u>Section 2.1</u> to occur.

2.2    <u>Access to Information</u>.  From the date hereof until the earlier of the Closing or termination of this Agreement in accordance with its terms, subject to all nondisclosure agreements between the Buyer and Seller and any applicable Laws, Seller shall (a) afford Buyer and its representatives full and free access to and the right to inspect all of the properties, Assets, premises, books and records, Contracts and other documents and data related to the Seller or its Business or the Purchased Assets; (b) furnish Buyer and its representatives with such financial, operating and other data and information related to the Seller or its Business or the Purchased Assets as Buyer or any of its representatives may reasonably request; (c) instruct the representatives of Seller to cooperate with Buyer in its investigation of the Business; and (d) allow Buyer reasonable access to Seller personnel for the purposes of post-Closing integration.  Any investigation pursuant to this <u>Section 2.2</u> shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business.  No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

2.3    <u>Notice of Certain Events</u>.

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 20 of 51

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct, or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 6.1 being satisfied;

(ii)    any notice or other communication from any Person alleging that the Consent of such Person is or may be required in connection with the Transactions;

(iii)    any notice or other communication from any Governmental Authority in connection with the Transactions;

(iv)    any Proceedings commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.8 of this Agreement or that relates to the consummation of the Transactions; and

(v)    the existence of any facts, circumstances or occurrences that, if existing or occurring on or before the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.10 of this Agreement.

(b)    Should any such fact or condition require any change to the Disclosure Schedule or should Seller become aware of any event, fact or condition that would cause Seller's representations and warranties in this Agreement to be untrue or make the satisfaction of the conditions to Buyer's obligation to close the Transactions impossible or unlikely, Seller shall promptly deliver to Buyer a supplement to the Disclosure Schedule specifying such change (such supplement, "Schedule Supplement"); provided, however, that such Schedule Supplement shall not affect or limit any rights of Buyer under Section 6.1(a) or Article VIII, nor shall such Schedule Supplement be deemed to cure any breach of any representation or warranty contained herein.

2.4    Tax Matters.    Before and after the Closing, Seller and Buyer shall reasonably cooperate, and shall cause their respective equityholders, Affiliates, officers, employees and agents to reasonably cooperate, in preparing and filing all Tax Returns, in resolving any audits or disputes relating to Taxes and in connection with any other matters relating to Taxes. Such cooperation shall include the retention and (upon the other party's request and at the other party's expense) the provision of records and information which are reasonably relevant to any such Tax Return audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

2.5    Bulk Transfer Laws. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens, Encumbrances or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be reasonably necessary or

10

appropriate to so provide in the Sale Approval Order. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted by applicable Law, compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws in all applicable jurisdictions in respect of the Transactions. This Section 2.5 shall not affect any obligation of the Seller with respect to Transfer Taxes, Excluded Liabilities or Excluded Assets.

2.6     Employees.  No fewer than three (3) Business Days prior to the Closing Date, effective as of but contingent upon the occurrence of the Closing, Seller shall terminate the employment of all employees of the Business employed by Seller (each individual, an "Employee" and collectively, "Employees") to the extent such employees are offered employment with Buyer as set forth in this Section 2.6.  Buyer intends to offer to each Employee an "at will" position (a) that is reasonably comparable to the nature of such individual's position as an employee of Seller prior to the Closing, and (b) with a salary or other current cash compensation at a level reasonably comparable in the aggregate to the Employee's salary or other current compensation received as an employee of Seller at the Closing Date.  Nothing contained in this Agreement shall confer upon any Employee any right to any term or condition of employment or to continuance of employment by Buyer or any of its Affiliates, nor shall anything herein interfere with the right of Buyer or any of its Affiliates to terminate the employment of any employee, including any Employee, at any time, with or without notice and for any or no reason, or restrict Buyer or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Employee, after the Closing.  Seller shall provide Buyer with a true and accurate list, by date and location, of all employee layoffs implemented by Seller in the ninety (90) days preceding the Closing.  Buyer shall have no liability to Seller whatsoever under the WARN Act, California WARN Act or North Carolina Warn Act arising as a result, in whole or in part, of Buyer's actions or omissions occurring before, on or after the Closing Date.

2.7     Reasonable Best Efforts.  Subject to the terms and conditions hereof, the Parties agree to use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as reasonably practicable the Transactions and to cooperate with the others in connection with the foregoing, including using their reasonable best efforts to obtain all necessary Permits, licenses, waivers, Consents and approvals from other parties to the assignment of the Assumed Contracts or the operation of the Business.  After the date hereof, Seller shall consult with Buyer prior to making any filings with, or having any communications with, any Governmental Authority with respect to the Seller or this Agreement.

2.8     Nonassignable Contracts.  To the extent that the assignment under this Agreement, the Sale Approval Order and/or the Executory Contract Approval Order by Seller to Buyer of any Assumed Contract is not permitted or is not permitted without the Consent of any other party to such Assumed Contract, this Agreement shall not be deemed to constitute an assignment of such Assumed Contract if such Consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, such Assumed Contract, and Buyer shall assume no Liabilities thereunder.  Seller shall advise Buyer promptly in writing with respect to any Assumed Contract for which it knows or has reason to know that it will not receive any required Consent relating to assignment thereof.  Without in any way limiting Seller's obligations to use its their reasonable best efforts to obtain all Consents necessary for the sale, transfer, assignment and delivery of the Assumed Contracts and the Purchased Assets to Buyer

11

hereunder, if any such Consent is not obtained or if such assignment is not permitted irrespective of Consent and, at Buyer's election, the Closing hereunder is consummated, Seller shall cooperate with Buyer in any reasonable arrangement designed by Buyer to provide Buyer with the rights and benefits, subject to the obligations, under such Assumed Contract, including enforcement for the benefit of Buyer of any and all rights of Seller against any other Person arising out of breach or cancellation by such other Person of such Assumed Contract and, if requested by Buyer, Seller shall act as an agent on behalf of Buyer or as Buyer shall otherwise reasonably require.

## ARTICLE III
## CERTAIN ADDITIONAL COVENANTS

3.1 <u>Tax Covenants</u>.

(a) All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) (collectively, the "<u>Transfer Taxes</u>"), incurred in connection with the Transactions shall be paid by Seller. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Transfer Taxes (and Buyer, to the extent reasonably requested by Seller and only if Seller provides Buyer with an opportunity to review and approve each relevant Tax Return, shall cooperate with respect thereto as necessary).

(b) All real property, personal property, ad valorem or other similar Taxes (not including Income Taxes) levied against or with respect to the Purchased Assets for any taxable period or portion thereof for a taxable period that includes but does not end on the Closing Date (each, a "<u>Straddle Period</u>") that have not been paid prior to the Closing (collectively, the "<u>Apportioned Obligations</u>") shall be apportioned between Buyer and Seller based on the number of days included in the Straddle Period through and including the Closing Date (which amount shall be apportioned to Seller) and the number of days starting after the Closing Date, provided that, for purposes of determining the Apportioned Obligations, if a bill or notice for the relevant taxable period in respect of the Apportioned Obligations has not yet been received or issued (each, an "<u>Unbilled Apportioned Obligation</u>"), for purposes of determining the amount of the Unbilled Apportioned Obligation for the portion of the Straddle Period ending on the Closing Date, Seller and Buyer agree that the relevant Apportioned Obligations shall be determined by assuming that the relevant Tax owed for such period equals one hundred thirty percent (130%) of the amount of such Tax as set forth on the most recent bill or notice that is available. For purposes of this Agreement, in the case of any Straddle Period, the amount of any Taxes other than the Apportioned Obligations shall be determined based on an interim closing of the books as of the close of business on the Closing Date. For the avoidance of doubt, the foregoing provisions of this <u>Section 3.1(b)</u> are not intended to alter, and shall not be interpreted as altering, the obligations or indemnification requirements of Seller in respect of any Taxes as provided in this Agreement (including with respect to any Excluded Liability, breach of a representation or warranty under <u>Section 4.16</u> (Tax Matters) or Transfer Taxes of <u>Section 3.1(a)</u>).

(c) Before and after the Closing, Seller and Buyer shall reasonably cooperate, and shall cause their respective equityholders, Affiliates, officers, employees and agents to reasonably cooperate, in preparing and filing all Tax Returns, in resolving any audits or disputes relating to Taxes and in connection with any other matters relating to Taxes. Such cooperation

12

shall include the retention and (upon the other party's request and at the other party's expense) the provision of records and information which are reasonably relevant to any such Tax Return audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(d)　　Unless otherwise determined in writing by Buyer, the "standard" procedure of IRS Revenue Procedure 2004-53 (2004-2 C.B. 320) shall be used by the Buyer and Seller (and its Affiliates) in respect of any employees rehired by Buyer.

3.2　　<u>Retained Assets; Certain Transitional Matters</u>.　After the Closing, to the extent that title to any Asset other than the Excluded Assets that was used exclusively in or was required for the Ordinary Course of Business of the Business prior to the Closing is retained by Seller after the Closing, upon the request of Buyer, Seller shall promptly transfer any such asset to Buyer for the payment of no additional consideration and such assets shall be held in trust for Buyer pending such transfer.　From and after the Closing, if (a) Seller receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, the Seller shall remit such funds to Buyer within five (5) Business Days after receipt thereof or (b) Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliates shall remit such funds to the Seller within five (5) Business Days after receipt thereof.

3.3　　<u>Protections for Payment of Bid Protections</u>. The Sale Procedures Order will provide that the Break-Up Fee and the Expense Reimbursement will be paid by the Seller and its bankruptcy estate when due and, as applicable, the Break-Up Fee and the Expense Reimbursement will be paid from the sources (*e.g.*, the Break-Up Fee and the Expense Reimbursement are payable as the initial uses of the proceeds obtained from any consummated sale transaction) and at the times specified in this Agreement.　The exact wording of such provisions must be reasonably acceptable to both the Seller and Buyer.

3.4　　<u>Name Change</u>. No later than five (5) Business Days after the Closing Date, Seller shall take all necessary action to change its name and the names of all Affiliates of Seller to a name that does not include the word "Precision Swiss Products" or "PSP" or any other name or mark included in the Purchased Assets (including any name set forth on the signature pages to this Agreement) or confusingly similar to any such name or mark (collectively, the "<u>Restricted Names</u>") and shall withdraw all assumed names containing Restricted Names.  Seller shall seek to obtain all required authority for such name change(s) in the Sale Approval Order.  Seller shall promptly notify Buyer of such name change(s) and the new name(s) chosen by Seller and all Affiliates of Seller, as applicable.  After Closing, without limiting Buyer's rights in any intellectual property included in the Purchased Assets, Seller and all Affiliates of Seller shall cease all use of any Restricted Name (other than as permitted by fair use), including by removing all Restricted Names from all letterhead, stationery, signage and tangible assets included in the Excluded Assets.

<u>Transition Services</u>.　In order to effect an orderly transition of the Business and as a condition to consummating the Transactions, for a period of twelve (12) months following the Closing Date unless Buyer provides written notice of an earlier end date, each of Norbert Kozar and Melissa Kozar covenants and agrees to use his or her good-faith efforts to:  (i) provide Buyer with services substantially similar to those performed by such Person in his or her role with Seller immediately prior to the date hereof and the Closing, or such services as reasonably requested by

13

Buyer from time to time, in each case in order for the Business to be transitioned to Buyer following Closing; and (ii) reasonably assist Buyer with recruiting, hiring, onboarding and training the Employees. Each of Norbert Kozar and Melissa Kozar shall perform all such services at the same standard, degree and level of care, skill, diligence and service as such services were provided immediately prior to the date hereof and the Closing, and otherwise consistent with past practices. Nothing contained herein shall (a) create any third-party rights in any current or former employee, director, manager, officer, independent contractor, consultant or other service provider of Buyer or any of its Affiliates or (b) create any right in any employee or other Person to any continued employment with Buyer or any of its Affiliates.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

4.1     <u>Organization, Good Standing and Qualification</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all requisite corporate power and authority to carry on the Business as now conducted and as proposed to be conducted.  Seller is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.  Each such jurisdiction is listed on <u>Schedule 4.1</u> of the Disclosure Schedule. Subject only to the approval of the Bankruptcy Court, Seller has all the requisite power and authority to hold, lease, manage, buy, sell and operate all of the Assets, as applicable, owned by Seller.

4.2     <u>No Subsidiaries</u>.  Seller has no Subsidiaries.  Seller does not, directly or indirectly, own, and is not a party to, any Contract to acquire any capital stock or other equity or ownership securities of any corporation, limited liability company, partnership or other entity.

4.3     <u>Authorization; Enforceability</u>.  Subject only to the approval of the Bankruptcy Court, Seller has full corporate, individual or other legal power and capacity, as applicable, and authority to execute and deliver this Agreement and the other Transaction Documents to which Seller is a party and to perform its obligations hereunder and thereunder.  All corporate and other action on the part of Seller and their respective officers, partners and directors and shareholders necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party and the performance of all obligations of Seller hereunder and thereunder has been taken.  Upon the approval of the Bankruptcy Court, this Agreement and the other Transaction Documents each constitutes a valid and legally binding obligation of Seller enforceable in accordance with its terms.

4.4     <u>No Conflict</u>.  Provided that the Sale Approval Order is entered and the Consents listed on Schedule 4.4 of the Disclosure Schedule have been obtained, except as may result from any facts or circumstances relating to Buyer or its Affiliates (as opposed to any other third party or its Affiliates), the execution, delivery, and performance by the Seller of the Transaction Documents do not and will not (i) violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of the Seller; or (ii) violate, conflict with, result in a breach of or constitute a violation or default (or any event

14

that, with notice or lapse of time or both would constitute a default) under or give rise to any right of termination, cancellation, modification or acceleration of, or loss of a material benefit under, any Contract; or (iii) violate in any material respect any Law or Order applicable to the Seller.

4.5     Governmental Authorities; Consents.  Except for the Sale Approval Order and the Sale Procedures Order, no approval, Order, authorization, registration, qualification, designation, declaration or filing of or with, or notice to, or other Consent of, any Governmental Authority or other Person on the part of Seller is required in connection with the execution and delivery of this Agreement and the consummation of the Transactions, except as disclosed in Schedule 4.5 of the Disclosure Schedule.

4.6     Legal Compliance.  Seller has at all times complied in all material respects with all applicable Laws (including Applicable Anti-Corruption Laws and Trade Laws), and no Proceeding or notice has been filed, given or commenced against Seller alleging any failure so to comply.

4.7     Licenses, Permits, Orders and Authorizations.  Schedule 4.7 of the Disclosure Schedule contains a complete and accurate list of all licenses, approvals, Consents, franchises, authorizations, security clearances and other permits of, from or with, any Governmental Authority ("Permits"), which are held by or applicable to Seller.  No other Permits are required under applicable Laws to permit Seller to own, operate, use and maintain the Purchased Assets in the manner in which they are now operated and maintained and to conduct the Business as currently conducted or proposed to be conducted.  Seller is not party or subject to the provisions of any Order of any Governmental Authority.  Seller is and has been in full compliance with the terms of all Permits and all Permits are valid and in full force and effect.

4.8     Litigation.  Except for the Chapter 11 Case, as of the Effective Date, no Proceedings are pending or, to the Knowledge of Seller, threatened against the Seller (i) that would prevent or materially impair or delay the ability of the Seller to consummate the Transactions or (ii) with respect to the Assumed Contracts.

4.9     Title to, and Nature of, Assets.  Upon the Closing Date, the Purchased Assets are owned by the Seller.  Upon Closing, subject to requisite Bankruptcy Court approvals and the terms of the Sale Approval Order, and assumption by the Seller of the applicable Assumed Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs), Buyer will acquire from the Seller good and valid title to or, as applicable, a valid leasehold interest in the Purchased Assets, free and clear of all Encumbrances.

4.10    Material Adverse Change.  Seller has made Buyer aware of any Material Adverse Change.

4.11    Intellectual Property.  Schedule 4.11(a)(i) of the Disclosure Schedule lists all of the material Intellectual Property Assets owned by Seller which is a registered or common law trademark, trade name, copyright, domain name, patent, or patent application (the "Owned Intellectual Property").  Schedule 4.11(a)(ii) of the Disclosure Schedule lists all registrations and applications for Owned Intellectual Property in the name of Seller.  Except as set forth on Schedule 4.11(a)(iii) of the Disclosure Schedule, Seller is not bound by or a party to any options,

15

licenses or agreements of any kind with respect to the Intellectual Property Assets of any other Person other than such licenses or agreements arising from the purchase of "off-the-shelf," or standard products. Seller has paid all fees and filed all documents due prior to the date hereof that are necessary to obtain or maintain the Intellectual Property Assets in force or the exclusive rights thereto. Seller owns (or has the right to use pursuant to written agreement) all Intellectual Property Assets necessary for the operation of the Business as presently conducted by Seller. Seller has taken reasonable precautions to maintain and protect each item of its Owned Intellectual Property. Except as disclosed on <u>Schedule 4.11(b)</u> of the Disclosure Schedule, no other Person has any rights of ownership, or license to use, the Owned Intellectual Property. The conduct of the Business does not infringe or otherwise conflict in any material respect with the rights of any Person in respect of Intellectual Property Assets. To the Seller's Knowledge, none of the Owned Intellectual Property is being infringed or otherwise used or being made available for use by any third party, without license or permission from Seller. Seller has taken all necessary and commercially reasonable steps to protect and preserve the confidentiality of all Trade Secrets included in the Intellectual Property Assets and all disclosure to, any Person of such Trade Secrets has been pursuant to the terms of a valid, written confidentiality agreement with such Person that is legally enforceable by Seller.

4.12   <u>Notes and Accounts Receivable</u>.  All notes and Accounts Receivable of Seller arose from bona fide third-party sales in the Ordinary Course of Business consistent with past practice, are reflected properly on the books and records of Seller, are valid receivables subject to no setoffs or counterclaims, are current, are not in dispute, and are collectible using commercially reasonable efforts in the Ordinary Course of Business within one hundred twenty (120) days following the Closing Date.

4.13   <u>Assumed Contracts</u>.   Seller has delivered to Buyer a correct and complete copy of each Assumed Contract as amended to date.  With respect to each such Assumed Contract: (i) the Assumed Contract is legal, valid, binding, enforceable, and in full force and effect; (ii) the Assumed Contract is assignable to Buyer without any Consent of any Person except as set forth in <u>Schedules 4.5, 4.6</u> and <u>4.13(b)(ii)</u> of the Disclosure Schedule and will continue to be legal, valid, binding, enforceable by Buyer, and in full force and effect on identical terms following the consummation of the Transactions; (iii) to Seller's Knowledge no Party has repudiated any provision of the Assumed Contract.  Other than the Contracts set forth on <u>Schedule 4.13</u> of the Disclosure Schedule and the Excluded Contracts, Seller is not party to any Contract.

4.14   <u>Inventories</u>.  All Inventory of Seller consists of a quality and quantity usable and, with respect to finished goods, saleable, in the Ordinary Course of Business.  Seller is not in possession of any goods not owned by Seller.  Except as set forth in <u>Schedule 4.14</u> of the Disclosure Schedule, the Inventory (other than goods in transit) is located on the real property. None of the Inventory is held on a consignment basis.

4.15   <u>Employees; Labor Agreements and Actions; Benefit Plans</u>.  Except as set forth on <u>Schedule 4.15(a)</u> of the Disclosure Schedule sets forth (a) all employment, consulting or severance agreements between Seller and any current or former employee or consultant of Seller and (b) agreements with Seller and any employee or consultant which include covenants against competition, solicitation of customers or employees or similar restrictive restrictions.  Seller has delivered or made available to Buyer true, correct and complete copies of each such agreement, as

16

amended to date. Seller (x) is not party to or bound by any collective bargaining or similar agreement with any labor organization, (y) has no employees that are represented by any labor organization and (z) has no Knowledge of any union organizing activities among employees of Seller. Seller has made available to Buyer summaries of all material employee benefit plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business.

4.16    Taxes.  Seller has timely filed all material Tax Returns required to be filed (taking into account any extensions of time to file such Tax Returns) and all such material Tax Returns were complete and accurate in all material respects. The Debtor owes Taxes including but not limited to Federal (est. $1,143,155), state (unknown) and county Taxes (est. $66,576) incurred pre-petition and Taxes the payment of which was precluded by reason of the Chapter 11 Case (which are set forth on Schedule 4.16(a) of the Disclosure Schedule).  Except as set forth in this Section 4.16 or on Schedule 4.16(b) of the Disclosure Schedule, there are no (i) material deficiencies for any Taxes that have been proposed, asserted or assessed in writing by a Governmental Authority against Seller that are still pending, (ii) audits or examinations outstanding by a Governmental Authority against the Seller with respect to Taxes or (iii) written notices received by the Seller from any Governmental Authority indicating an intent to open an audit, examination or other review with respect to a Taxes or a request for information related to Taxes, with respect to Seller, as to each of clause (i), clause (ii) and clause (iii) above, to the extent such deficiency, audit or examination could give rise to an Encumbrance on the Purchased Assets. There are no Encumbrances for Taxes on the Purchased Assets, other than as set forth on Schedule 4.16(c) of the Disclosure Schedule.

4.17    Brokers' Fees.  Excluding SC&H Group ("SC&H" (whose fees and expenses shall be the responsibility of Seller), Seller has not engaged, consented to, or authorized any other broker, investment banker, or other third party to act on its behalf, directly or indirectly, as a broker or finder in connection with the Transactions, and that no such other third party is entitled to any fee or compensation in connection with this Agreement or the Transactions by reason of any action of it.  Seller shall indemnify, defend and hold harmless the Buyer from any and all claims of any broker, investment banker, or other broker or finder, arising by, through or under either of them in connection with the Transactions.  Buyer shall not be responsible for any fees or expenses of SC&H or any attorneys, accountants, advisors, brokers or other professionals employed by or retained by the Seller or any statutory committee appointed in the Chapter 11 Case.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

5.1    Organization and Good Standing.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.

5.2    Authorization; Enforceability.  Buyer has full limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder.  All limited liability company action on

17

the part of Buyer, its respective officers, directors, managers and members necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents and the performance of all obligations of the Buyer hereunder and thereunder has been taken or will be taken prior to the Closing. This Agreement and the other Transaction Documents each constitutes, or when executed and delivered will constitute, a valid and legally binding obligation of Buyer, enforceable in accordance with its terms.

5.3     No Conflict. Buyer is not in violation of nor in default under any provision of its Organizational Documents or of any Order to which it is a party or by which it is bound, or of any Law applicable to it. Except as set forth in Schedule 5.3 of the Disclosure Schedule, the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transactions will not result in any conflict with, violate, result in any breach of any of the provisions of, constitute a default under (with or without notice or lapse of time or both), or give rise to a right of acceleration, termination or cancellation under or imposition of any obligation under, any such provision.

5.4     Governmental Authorities; Consents. Except as set forth in Schedule 5.4 of the Disclosure Schedule, no Consent, Order or authorization of, or registration, qualification, designation, declaration or filing with, or notice to, any Governmental Authority or other Person on the part of Buyer is required in connection with the execution and delivery of this Agreement and the consummation of the Transactions.

5.5     Certain Proceedings. There is no Proceeding pending or currently threatened against Buyer that questions the validity of this Agreement or the other Transaction Documents or the right of Buyer to enter into, or to consummate the Transactions, nor is Buyer aware that there is any basis for the foregoing.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

6.1     Conditions to Obligations of Buyer. The obligation of Buyer to close on the Transactions (including the obligation of Buyer to purchase the Purchased Assets) is subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. The representations and warranties made by Seller in this Agreement and any of the Transaction Documents shall be true and correct when made and on and as of the Closing Date as though such representations and warranties were made on and as of such date (except that those representations and warranties that are made as of a specified date shall be true and correct only as of such date). Seller shall have duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by Seller at or prior to Closing.

(b)     Sale Approval Order. The Bankruptcy Court shall have entered the Sale Approval Order on or before December 15, 2024, and the Sale Approval Order shall not be subject to any stay, shall not have been vacated and shall become effective immediately upon its entry by the Bankruptcy Court, and the Seller shall not have breached any applicable provision of the Sale Approval Order in any respect, which Sale Approval Order:

18

(i) approves the Transactions and this Agreement;

(ii) approves the sale, transfer and assignment of the Purchased Assets to Buyer free and clear of any and all liens, claims and Encumbrances, including but not limited to all: (i) successor liability obligations under applicable law; (ii) collective bargaining agreement obligations, if any; (iii) pension and other retiree obligations, if any; and (iv) claims for taxes assessed by, or owing to, any governmental entity, but expressly subject to Permitted Encumbrances, and Assumed Liabilities;

(iii) provides that any and all valid "Interests" (as defined in the Bankruptcy Code) including but not limited to liens, claims and Encumbrances, shall attach to the cash component of the Purchase Price at Closing;

(iv) approves Seller's assumption and assignment of the Assumed Contracts, in accordance with Section 365 of the Bankruptcy Code, in which case the Sale Approval Order shall be deemed to be the Executory Contract Approval Order for purposes hereof; and

(v) contains a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

(c) <u>Executory Contract Approval Order</u>. The Bankruptcy Court shall have entered the Executory Contract Approval Order on or before December 15, 2024, and the Executory Contract Approval Order shall not be subject to any stay, shall not have been vacated and shall become effective immediately upon its entry by the Bankruptcy Court, and the Seller shall not have breached any applicable provision of the Executory Contract Approval Order in any respect.

(d) <u>No Proceedings</u>. No Proceeding shall be pending or threatened wherein an unfavorable Order could (i) prevent consummation of any of the Transactions, (ii) cause any of the Transactions to be rescinded following consummation, or (iii) have a Material Adverse Effect on the right of Buyer, after the Closing, to own the Purchased Assets and to operate the Business as now conducted, and no such Order shall be in effect.

(e) <u>No Material Adverse Effect</u>. No event, change, loss, condition or state of facts shall have occurred that may have any Material Adverse Effect on the Business, Seller or the Purchased Assets.

(f) <u>Transaction Documents</u>. The Transaction Documents shall have been executed and delivered by the parties thereto (other than the Buyer).

(g) <u>Other Actions; Deliverables</u>. Buyer shall have received all of the items required to have been delivered pursuant to <u>Section 1.5(a)</u>.

6.2 <u>Conditions to Obligations of Seller</u>. Seller's obligation to sell the Purchased Assets of Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of the following conditions:

19

(a)    Representations and Warranties.  The representations and warranties made by the Buyer in this Agreement and any of the Transaction Documents shall be true and correct when made on and as of the Closing Date as though such representations and warranties were made on and as of such date (except that those representations and warranties that are made as of a specified date shall be true and correct only as of such date), except where the failure of such representations and warranties affect the Buyer's ability to consummate the Transactions. The Buyer shall have duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Buyer at or prior to Closing.

(b)    Transaction Documents.  The Transaction Documents shall have been executed and delivered by the parties thereto, and all other items to be delivered by Buyer under Section 1.5(b) shall have been delivered to Seller.

(c)    Other Actions; Deliverables.  Seller shall have received all of the items required to have been delivered pursuant to Section 1.5(b).

(d)    The Bankruptcy Court shall have entered the Sale Approval Order.

## ARTICLE VII
## METHOD OF SALE; BANKRUPTCY PROVISIONS

7.1    Sale Motion.  As promptly as practicable after the Filing Date, Seller shall file a motion in the Chapter 11 Case seeking the entry of an order (and/or orders) (i) approving the sale process for the sale of substantially all of the Purchased Assets and the bidding process; (ii) approving the bid procedures, including the "Bid Protection" and "Break-Up Fee" in favor of Buyer, as defined in, and pursuant to, this Article VII and the Sale Procedures Order (collectively, the "Bid Process"); (iii) scheduling the "Initial Bid Deadline," "Qualifying Offer," "Auction" and "Sale Hearing", as those terms are defined below; (iv) approving the form, and recipients, of the notice of the Sale Hearing; (v) authorizing the sale of the Purchased Assets free and clear of liens, claims, Encumbrances and interests other than Permitted Encumbrances; and (vi) for such other relief as is necessary, reasonable and customary in connection therewith ("Sale Motion"; provided, for the avoidance of doubt, that the Sale Motion need not seek any approvals set forth in this Section 7.1 to the extent the Bankruptcy Court already approved such matters in the Sale Procedures Order).

7.2    Sale Procedures Order.  Seller shall seek to obtain the entry in the Chapter 11 Case of an order, in form and substance reasonably acceptable to Buyer, granting the relief sought by Seller in the Sale Motion in all material respects concerning the sale and Bid Process ("Sale Procedures Order") as soon as practicable after the Filing Date.

7.3    Competing Bids.  Purchaser acknowledges that in connection with the sale of the Assets and continuing until the Initial Bid Deadline, Seller and SC&H, the investment banking/financial advisory firm retained by Seller, shall be seeking competitive bids in accordance with the Sale Procedures Order for the Assets (each, a "Competing Bid") and will be authorized to market to the public the Assets and provide access to the due diligence room to potential bidders in such manner as Seller, in its sole discretion, after consulting with SC&H, deems appropriate. Seller shall inform prospective bidders desiring to the submit a Competing Bid that the Assets are

20

available for purchase and will be sold to the highest and best "Qualifying Offer(s)", as defined below, submitted at an auction to be conducted by Seller at the offices of Kornfield, Nyberg, Bendes, Kuhner & Little, P.C. in Oakland, CA, or such other location identified in the Sale Procedures Order, at 10:00 a.m. on December 11, 2024, or such later date as ordered by the Bankruptcy Court ("Auction"), and approved by the Bankruptcy Court at a hearing to be held in the Chapter 11 Case thereafter ("Sale Hearing"). Seller may seek offers in one or more lots for the Purchased Assets, but the aggregate of all such bids must meet or exceed the Purchase Price plus the Bid Protection to constitute a higher and better offer than contained in this Agreement, or as may be increased at the Auction.

   7.4 <u>Receipt of Qualifying Offers</u>. Subject to the provisions of the Sale Procedures Order and this Agreement, Seller shall be authorized to receive and consider Qualifying Offer(s) from third parties at the Auction to purchase the Purchased Assets in one or more lots. In the event that a Qualifying Offer(s) is received, subject to the Bid Protection, Seller will continue at the Auction to seek higher bids, in an open-cry-auction-like format, in minimum increased increments of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), or such lesser amount as Seller shall reasonably determine, for all subsequent bids for the Purchased Assets until no further bids are made. In the event there is no Qualifying Offer, Seller shall cancel the Auction and Buyer's bid as set forth in this Agreement shall be deemed accepted by Seller.

   7.5 <u>Qualifying Offers</u>. For purposes hereof, a "<u>Qualifying Offer</u>" shall meet the requirements as set forth in the Sale Procedures Order which includes, among other things, a bona fide, binding, and duly executed written offer(s) to purchase the Purchased Assets in bulk, or in lots, received by 4:00 p.m. (Pacific time), on or before December 5, 2024 ("<u>Initial Bid Deadline</u>"), which: (i) is in the form and substance substantially similar to this Agreement, excluding only provisions pertaining to the Bid Protection in favor of Buyer; (ii) is irrevocable until the conclusion of the Sale Hearing; (iii) is accompanied by a cashiers' check or wire transfer in the amount of $500,000.00 to be held by the Seller in escrow; (iv) is accompanied by such evidence reasonably acceptable to Seller, after consultation with SC&H, demonstrating the proposed bidder's ability to close the proposed transaction. <u>All Qualifying Offers must disclose the material terms and conditions of any contemplated employment or consulting agreement with any former or current insider of Seller</u>.

   7.6 <u>Bid Protection</u>. In order to commence an Auction, a Qualifying Offer must also not be less than an amount equal to the Purchase Price plus the Break-Up Fee plus the Expense Reimbursement plus Two Hundred Fifty Thousand and 00/100 Dollars $250,000.00 (the "<u>Initial Overbid Amount</u>") and such Qualifying Offer(s) is on terms and conditions substantially similar to those of Buyer contained herein. The Break-Up Fee, Expense Reimbursement and Initial Overbid Amount are collectively the ("<u>Bid Protection</u>").

   7.7 <u>Further Bids</u>. Buyer shall be entitled to submit further bids at the Auction, in bulk or in lots, in the event that a higher and better Qualifying Offer than Buyer's bid reflected herein. In the event that the highest and best Qualifying Offer is submitted at the Auction by a purchaser other than Buyer, then after consultation with SC&H, Seller shall (i) be entitled to accept such other Qualifying Offer ("<u>Prevailing Bid</u>" or "<u>Prevailing Bidder</u>"), and (ii) announce the next highest or otherwise best bid to constitute a back-up bid ("<u>Back-Up Bidder</u>"), and submit each for approval at the Sale Hearing.

7.8    Confidentiality.  Seller shall have the right to provide any third party with any information which that third party reasonably requests concerning the Business and/or the Assets so as to allow that third party to have the information on which to base a bid for the Assets; provided however, that Seller must first obtain the execution and delivery of a confidentiality agreement from said third party(s), in form and substance substantially similar to the confidentiality agreement by Buyer.

7.9    Break-Up Fee and Expense Reimbursement.

(a)    The Sale Procedures Order will provide that the Break-Up Fee and the Expense Reimbursement will be paid by the Seller and its bankruptcy estate when due and, as applicable, from the sources (i.e., the Break-Up Fee and the Expense Reimbursement are payable as the initial uses of the proceeds obtained from any consummated sale transaction) and at the times specified in this Agreement.  The exact wording of such provisions must be reasonably acceptable to both the Seller and Buyer.

(b)    To the extent approved under the Sale Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with evaluating whether to purchase the Assets, this Agreement and the negotiation thereof and the identification and quantification of Assets of the Seller, the Seller shall pay Buyer, in accordance with the terms hereof, (i) a break-up fee in an amount equal to three percent (3%) of the Purchase Price (the "Break-Up Fee"), plus (ii) an aggregate amount of up to $200,000 for all of the actual, documented and reasonable out of pocket costs, fees and expenses that are incurred or to be incurred by Buyer, including all reasonable out of pocket travel expenses and all fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer, in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of this Agreement, the Transactions, and the Chapter 11 Case (such costs, fees and expenses, the "Expense Reimbursement").  Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.9 are an integral part of the Transactions and this Agreement and that the Break-Up Fee and the Expense Reimbursement are not a penalty, but rather are liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Break-Up Fee and/or Expense Reimbursement are payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.  Claims of Buyer in respect of the Break-Up Fee and the Expense Reimbursement hereunder are and constitute allowed superpriority administrative expense claims against the Seller under Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Chapter 11 Case.

(c)    The Break-Up Fee and Expense Reimbursement shall be payable by the Seller upon the occurrence of a Trigger Event.  The Break-Up Fee and Expense Reimbursement shall be paid (or cause to be paid) by the Seller by wire transfer of immediately available funds to an account designated by Buyer as follows: (1) in the event of a Trigger Event under clauses (ii) or (iii), from the first proceeds of any sale or other disposition (including, for the avoidance of doubt, any "credit bid" under section 363(k) of the Bankruptcy Code), or of any financing (and no

22

other lender claims will attach thereto), within (Y) two (2) Business Days following the date of consummation of a Competing Bid, other transfer, or financing in the case of the Break-Up Fee, and (Z) in the case of the Expense Reimbursement, two (2) Business Days after Buyer submits to the Seller invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the Seller to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court, or (2) in the event of any other Trigger Event, within two (2) Business Days after Buyer submits to the Seller invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the Seller to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court.  The obligations set forth in this Section 7.9 with respect to the Break-Up Fee and Expense Reimbursement shall survive any termination of this Agreement.

   7.10 Bankruptcy Court Filings.

    (a) The Seller and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Sale Procedures Order and, except to the extent provided in the Sale Procedures Order, the Sale Approval Order.  In the event of any discrepancy between this Agreement and the Sale Procedures Order and the Sale Approval Order, the Sale Procedures Order and the Sale Approval Order shall govern.

    (b) The Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Assets and all non-debtor parties to the Assumed Contracts, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as Buyer may request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, Orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.

    (c) The Seller shall use commercially reasonable efforts to ensure that the proposed Sale Procedures Order and Sale Approval Order state that, the provisions of this Agreement, including (in each case) this Article VII, are reasonable, were a material inducement to Buyer, and were reasonably relied upon by Buyer in deciding, to enter into this Agreement and are designed to achieve the highest or otherwise best price for the Purchased Assets.

    (d) Subject to the Seller exercising its rights pursuant to Section 8.2, the Seller shall not, and shall cause its Affiliates not to, take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Procedures Order or, if applicable, if Buyer is the Prevailing Bidder at the Auction, the Sale Approval Order.  The Seller shall, and shall cause its Affiliates to, comply with the Sale Procedures Order and the Sale Approval Order.

    (e) Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Procedures Order and the Sale Approval Order and a finding of adequate assurance of future performance by Buyer, including furnishing witnesses, affidavits or other documents or information for filing with the

Case: 24-51678 Doc# 43 Filed: 11/14/24 Entered: 11/14/24 15:43:07 Page 34 of 51

Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(f)     The Seller shall be responsible for making all necessary filings with the Bankruptcy Court, which material filings, including any amendments, supplements, or modifications thereto, shall be in form and substance reasonably acceptable to Buyer. The Seller and Buyer shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval or modification of, as applicable, the Sale Procedures Order or the Sale Approval Order. The Seller shall provide (or shall cause their Representatives to provide) Buyer with advance drafts of, and a reasonable opportunity to review and comment upon, the Sale Motion, the Sale Procedures Order, the Sale Approval Order, and any substantive pleadings, motions, applications, petitions, schedules and supporting papers prepared by the Seller to be filed with the Bankruptcy Court (or, in each case, any amendments thereto) in furtherance of the Transaction as soon as reasonably practicable prior to the date the Seller intends to file such motion, pleading or Bankruptcy Court filing, and the Seller shall make any reasonable modifications of such documents requested by Buyer. In the event the entry of the Sale Procedures Order and the Sale Approval Order or any other Order of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Procedures Order, the Sale Approval Order or other such Order), the Seller shall use its respective commercially reasonable efforts to defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(g)     In accordance with the Sale Procedures Order or other Order of the Bankruptcy Court (or, if required by the Bankruptcy Court, a motion to assume and assign the Assumed Contracts), the Seller shall file with the Bankruptcy Court and send a cure notice in respect of each Assumed Contract with sufficient detail to provide adequate notice to the non-debtor parties to such Contracts, and shall set forth the applicable Cure Cost, if any, for each Assumed Contract as reasonably estimated in good faith by the Seller. Upon removal by Buyer of any Contract from Exhibit A in accordance with Section 1.6(d), the Seller shall promptly remove such Assumed Contract from the cure notice and notify the non-debtor parties to such Contracts of such removal.

## ARTICLE VIII
## TERMINATION

8.1     Termination Events. Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)     by the mutual written consent of the Seller and Buyer;

(b)     by the Seller, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing condition set forth in Section 6.2 not to be satisfied, and (i) such breach is not waived by the Seller or (ii) if such breach has not been waived by the Seller but is curable and is not cured

24

by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt of the Seller's notice of its intent to terminate and (B) the Outside Date (or such later date as agreed between the Seller and Buyer); provided, however, that the Seller is not then in material breach of this Agreement;

(c)     by Buyer, if the Seller shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Seller that would cause any Closing condition set forth in Section 6.1 not to be satisfied, and (i) such breach is not waived by Buyer or, (ii) if such breach has not been waived by Buyer but is curable and is not cured by the Seller prior to the earlier to occur of (A) ten (10) Business Days after receipt of Buyer's notice of its intent to terminate and (B) the Outside Date (or such later date as agreed between the Seller and Buyer); provided, however, that Buyer is not then in material breach of this Agreement;

(d)     by Buyer, if the Closing shall not have occurred by the Outside Date;

(e)     by either the Seller or Buyer, in the event that any Governmental Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Purchased Assets contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(e) shall not be available to the Seller or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order; and

(f)     by either the Seller or Buyer, if the Seller enters into a definitive agreement with respect to a Competing Bid, upon entry by the Bankruptcy Court of an Order approving such agreement.

8.2     Notice of Termination. If either the Seller or Buyer desires to terminate this Agreement pursuant to Section 8.1, such Party shall give written notice of such termination to the other Party.

8.3     Effect of Termination.  If this Agreement is terminated pursuant to Section 8.1, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 7.9, (iii) Section 8.1, (iv) this Section 8.3 and (v) Article X.  Nothing in this Section 8.3 shall be deemed to release any Party from any Liability for any breach by such Party of any term of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; provided, however, that, if this Agreement is validly terminated pursuant to this Article VIII, no Party shall have any remedy or right to recover for any Liabilities resulting from any breach of this Agreement (other than breaches of (i) Section 7.9 and (ii) Section 8.1), unless the breaching Party willfully and knowingly committed fraud against the non-breaching Party with the specific intent to deceive and mislead the non-breaching Party regarding the representations and warranties made in this Agreement.

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 36 of 51

# ARTICLE IX
## DEFINITIONS

9.1 <u>Certain Definitions</u>. In this Agreement, the following terms have the meanings set forth below, which shall be equally applicable to both the singular and plural forms. Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.

"<u>Accounts Receivable</u>" means, with respect to Seller, (a) all trade accounts receivable and other rights to payment from customers of Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller, (b) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes and (c) any claim, remedy or other right related to any of the foregoing.

"<u>Affiliate</u>" means, when used with reference to a specified Person, (i) any Person that directly or indirectly controls or is controlled by or is under common control with the specified Person or any other Affiliate of such Person, (ii) any Person that is an officer, director, trustee, general partner, manager or managing member of the specified Person or of which the specified Person or any other Affiliate of such Person is an officer, director, trustee, general partner, manager or managing member or (iii) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of the outstanding voting securities of the specified Person or any other Affiliate of such Person,. The meaning of the term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall depend upon the circumstance under which the affiliation of a Person is at issue; to wit: (i) if the only matter at issue is the relationship of one Person to another Person, without a specific action being at issue, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by Contract or otherwise, and (ii) if the ability of one Person to cause another Person to take, or refrain from taking, a specific action is at issue, the term "control" means the possession, directly or indirectly, of the power to direct or cause another Person to direct such action to be taken or not taken, whether through the ownership of voting securities or by Contract or otherwise.

"<u>Affiliated Group</u>" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign Income Tax-related Law) of which Seller has been a member.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Applicable Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, as administered and enforced by the U.S. Department of Justice and the U.S. Securities and Exchange Commission; any applicable Law implementing the Organization of Economic Cooperation and Development Convention on Combating the Bribery of Foreign Public Officials in International Business Transactions and any other applicable anti-bribery or anti-

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 37 of 51

corruption Law administered and enforced by a competent authority applicable to Seller, the Business or any operations or activities of Seller or the Business.

"Apportioned Obligations" has the meaning set forth in Section 3.1(b).

"Assets" means the Business and all properties, assets and rights of every kind, nature and description whatsoever whether tangible or intangible, real, personal or mixed, fixed or contingent choate or inchoate, known or unknown, wherever located, (including, without limitation, cash, cash equivalents, Accounts Receivable, Inventory, equipment, office furniture and furnishings, trade names, trademarks and patents, securities, Contracts, agreements, licenses and real estate) of Seller.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement, by and between Buyer and Seller dated the Closing Date as attached hereto as Exhibit B.

"Assumed Contracts" has the meaning set forth in Section 1.2(a)(v).

"Assumed Liabilities" has the meaning set forth in Section 1.2(c).

"Auction" has the meaning set forth in Section 7.3.

"Back-Up Bidder" has the meaning set forth in Section 7.7.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Process" has the meaning set forth in Section 7.1.

"Bid Protection" has the meaning set forth in Section 7.6.

"Break-Up Fee" has the meaning set forth in Section 7.9(b).

"Bulk Sales Laws" means (i) the bulk-transfer provisions of the Uniform Commercial Code or any similar laws in jurisdictions in which Seller conducts the Business or own any related assets and (ii) any Tax-related laws, or requirements of any jurisdiction relating to bulk sales, or requiring similar notification, certification or withholding requirements, in respect of a sale or transfer of assets, which laws are applicable to the sale of the Purchased Assets or Seller.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Chicago, Illinois or Milpitas, California are closed.

"Buyer" has the meaning set forth in the preamble.

"Chapter 11 Case" has the meaning set forth in the recitals.

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 38 of 51

"Closing" has the meaning set forth in Section 1.4.

"Closing Date" has the meaning set forth in Section 1.4.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Competing Bid" has the meaning set forth in Section 7.3.

"Consent" means any approval, consent, ratification, waiver, or other authorization of, notice to or registration, qualification, designation, declaration or filing with any Person, including without limitation, any governmental authorization.

"Contract" means any agreement, contract, option, license, instrument, mortgage, obligation, commitment, arrangement, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

"Cure Costs" has the meaning set forth in Section 1.6(d).

"Deposit" has the meaning set forth in Section 1.3(a).

"Disclosure Schedule" means the schedule attached to this Agreement entitled Disclosure Schedule.

"Effective Date" has the meaning set forth in the preamble.

"Employees" has the meaning set forth in Section 2.6.

"Encumbrance" means any charge, claim, community property interest, condition, easement, covenant, Contract, commitment, warrant, demand, encumbrance, equitable interest, lien, mortgage, charge, option, purchase right, pledge, security interest, right of first refusal, or other rights of third parties or restriction of any kind, including without limitation any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environment" shall mean any surface or subsurface physical medium or natural resource, including, ambient air, land surface or subsurface strata, soil, surface waters, ground waters, stream and river sediments, and biota.

Environmental Law" shall mean any federal, state, local or common law, statute, rule, regulation, ordinance, code, order or judgment (including the common law and any judicial or administrative interpretations, guidance documents, directives, policy statements, standards or opinions) relating to pollution, protection or preservation of human health or the Environment or the presence of, exposure to, or management, manufacturing, processing, distribution, generation, use, treatment, containment, transport, handling, storage, disposal, emission, discharge, or release of any Hazardous Substances into the Environment.

"Environmental Liabilities" shall mean any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, Encumbrances, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, remediation or defense of

28

any matter relating to human health, safety or the Environment of whatever kind or nature by any party, entity or authority, (A) which are incurred as a result of (i) the existence of Hazardous Substances in, on, under, at or emanating from any real property presently or formerly owned, operated or managed by Seller or any of its past or present Subsidiaries, (ii) the offsite transportation, treatment, storage or disposal of Hazardous Substances generated by Seller or any of its past or present Affiliates or (iii) the violation or alleged violation of any Environmental Laws or (B) which arise under the Environmental Laws.

"Excluded Assets" has the meaning set forth in Section 1.2(b).

"Excluded Contracts" has the meaning set forth in Section 1.2(b)(iii).

"Excluded Liabilities" has the meaning set forth in Section 1.2(d).

"Executory Contract Approval Order" has the meaning set forth in Section 1.6(c).

"Expense Reimbursement" has the meaning set forth in Section 7.9(b).

"Filing Date" has the meaning set forth in the recitals.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any federal, state, local, municipal, foreign, or other governmental or quasi-governmental authority, including without limitation any administrative, executive, judicial, legislative, regulatory or taxing authority of any nature of any jurisdiction (including without limitation, any governmental agency, branch, department, official, or entity and any court or other tribunal).

"Hazardous Substances" shall mean petroleum, petroleum products, petroleum-derived substances, radioactive materials, hazardous wastes, polychlorinated biphenyls, lead-based paint, radon, urea formaldehyde, asbestos or any materials containing asbestos, mold, biomedical waste, infectious material, per- and polyfluoroalkyl substances and any materials or substances regulated or defined as or included in the definition of "hazardous substances," "hazardous materials," "hazardous constituents," "toxic substances," "pollutants," "contaminants" or any similar denomination intended to classify or regulate substances by reason of toxicity, carcinogenicity, ignitability, corrosivity or reactivity under any Environmental Law. "Income Tax" means any federal, state, or local or non-U.S. income tax measured by or imposed on net income, including any interest, penalty or addition thereto, whether disputed or not.

"Income Tax Return" means any Tax Return relating to Income Tax, including any schedule or attachment thereto.

"Indebtedness" means: (i) all obligations of Seller for borrowed money, including all obligations evidenced by bonds, debentures, notes, mortgages (including chattel mortgages) or other similar instruments, including notes payable to any of its Affiliates; (ii) all obligations of Seller to pay the deferred purchase price of property or services recorded on the books of Seller (including employee compensation and other obligations arising from employee benefit programs and agreements or other similar employment arrangements), except for (A) trade and similar

29

accounts payable and accrued expenses and (B) obligations in respect of customer deposits or advances; (iii) all obligations of Seller in respect of performance bonds, banker's acceptances and letters of credit, including standby letters of credit; (iv) all obligations of Seller as lessee that are capitalized on the books of Seller; (v) all obligations of others guaranteed by Seller, including contingent obligations and obligations under derivative, hedging, swap, foreign exchange or similar instruments; (vi) all liabilities with respect to any current or former employee, officer or director of the Seller that arise before or on the Closing Date with respect to deferred compensation, severance payments, accrued but unpaid bonuses, unused vacation and personal holiday pay obligations, accrued paid time off, any change in control or other bonuses payable to employees or directors of the Business in connection with or as a result of the Transactions contemplated by this Agreement, workers' compensation claims, deferred payroll Taxes, and any employment Taxes payable by the Seller with respect to the foregoing and (vii) Apportioned Obligations payable in respect of a taxable period (or portion thereof) ending on or prior to the Closing Date as determined in accordance with Section 3.1(b).

"Initial Bid Deadline" has the meaning set forth in Section 7.5.

"Initial Overbid Amount" has the meaning set forth in Section 7.6.

"Intellectual Property Assets" means all trademarks, service marks, trade names, trade dress, including all goodwill associated with the foregoing, domain names, copyrights, Software, Internet websites, mask works and other semiconductor chip rights, and similar rights, and registrations and applications to register or renew the registration of any of the foregoing, all patents and patent applications, Trade Secrets and all other similar intellectual property rights.

"Inventory" or "Inventories" means all inventories of Seller, wherever located, including without limitation all finished goods, work in process, off-balance sheet inventories, inventories written off, raw materials, spare parts and all other materials and supplies to be used or consumed by Seller in the production of finished goods.

"IRS" means the Internal Revenue Service.

"Knowledge" of a particular fact or other matter means, in the case of an individual that (a) such individual is actually aware of such fact or other matter; or (b) a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter and, in the case of a Person other than an individual, that any individual who is serving, or who has at any time served, as a director, officer, partner, member, manager, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. Seller's Knowledge shall specifically include, without limitation of the foregoing, the Knowledge of any board member or officer of Seller, Norbert Kozar and Melissa Kozar[1].

---

[1] **Note to Draft**: Knowledge parties to be determined subject to ongoing diligence.

Case: 24-51678    Doc# 43    Filed: 11/14/24    Entered: 11/14/24 15:43:07    Page 41 of 51

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other statute, law, Order, constitution, rule, regulation, ordinance, principle of common law, treaty or other requirement of any Governmental Authority.

"Liability" means any liabilities of any kind whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether or not reflected or required by GAAP to be reflected on the most recent balance sheet of Seller) including, without limitation, any direct or indirect guarantee of any Liability of any other Person.

"Material Adverse Change" or "Material Adverse Effect" means, with respect to Seller or the Business, any events, changes or effects which, individually or in the aggregate, Buyer reasonably believes could reasonably be expected to have a material adverse effect to Seller, the Business, operations, Purchased Assets, condition (financial or otherwise) or results of operations or prospects of Seller as now conducted or proposed to be conducted.

"Notices" has the meaning set forth in Section 10.4.

"Order" means any award, decision, injunction, judgment, order, decree, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any referee, arbitrator or mediator.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including, without limitation, with respect to quantity and frequency).

"Organizational Documents" means, with respect to any Person, the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, certificate of formation, regulations, operating of limited liability company agreement, certificate of limited partnership, partnership agreement of such Person, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of such Person, including any amendments thereto.

"Outside Date" means December 31, 2024.

"Owned Intellectual Property" has the meaning set forth in Section 4.11.

"Party" has the meaning set forth in the preamble.

"Permits" has the meaning set forth in Section 4.7.

"Permitted Encumbrances" means, with respect to any Asset, (a) Liabilities for Taxes, assessments and other governmental levies, fees or charges imposed with respect to such Asset that are not yet due and payable or the amount of which is being properly contested in good faith and (in each case) for which appropriate reserves have been established in accordance with GAAP; (b) non-Tax related mechanics', carriers', workers', repairers' and similar statutory liens and similar liens for labor, materials or supplies provided with respect to such Asset incurred in the Ordinary Course of Business for amounts for which adequate reserves have been established

31

in accordance with GAAP (i) that are not yet due and payable or (ii) the amount of which is being properly contested in good faith and which would not, individually or in the aggregate, materially impair the use or occupancy of such Asset or the operation of the business of Seller as currently conducted using such Asset; (c) zoning and entitlement Laws, building codes and other land use Laws regulating the use or occupancy of such Asset that constitutes real property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such real property and are not violated by the current use or occupancy of such real property or the operation of the Business of Seller as currently conducted thereon; and (d) easements, covenants, conditions, restrictions and other similar matters of record affecting title to such real property which do not, individually or in the aggregate, materially interfere with the present or intended use or occupancy of the property or the operation of the Business as currently conducted thereon.

"Person" means any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Authority.

"Prevailing Bid" or "Prevailing Bidder" has the meaning set forth in Section 7.7.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Authority or referee, trustee, arbitrator or mediator.

"Purchase Price" has the meaning set forth in Section 1.3(a).

"Purchased Assets" has the meaning set forth in Section 1.2(a).

"Qualifying Offer" has the meaning set forth in Section 7.5.

"RCA" has the meaning set forth in Section 1.5(a)(vi).

"Restricted Names" has the meaning set forth in Section 3.4.

"Sale Approval Order" has the meaning set forth in Section 1.4.

"Sale Hearing" has the meaning set forth in Section 7.3.

"Sale Motion" has the meaning set forth in Section 7.1.

"Sale Procedures Order" has the meaning set forth in Section 7.2.

"Schedule Supplement" has the meaning set forth in Section 2.3(b).

"SC&H" has the meaning set forth in Section 7.3.

"Seller" has the meaning set forth in the preamble.

Case: 24-51678   Doc# 43   Filed: 11/14/24   Entered: 11/14/24 15:43:07   Page 43 of 51

"Software" means all computer software, including but not limited to, application software, system software and firmware, including all source code and object code versions thereof, in any and all forms and media, and all related documentation.

"Straddle Period" has the meaning set forth in Section 3.1(b).

"Subsidiary" means any Person in which Seller or any other Subsidiary directly or indirectly owns or controls any equity securities or other equity interests or has the power to elect a majority of that Person's board of directors or similar governing body, or otherwise has the power, directly or indirectly, to direct the business and policies of that Person.

"Tangible Personal Property" means all machinery, equipment, tools, furniture, fixtures, office equipment, computer hardware, supplies, spare parts, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned, leased or licensed by Seller (wherever located and whether or not carried on Seller's books), together with any express or implied warranty by the manufacturers or seller or lessors or licensors of any item or component part thereof and all maintenance records and other documents relating thereto.

"Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts and governmental impositions or charges of any kind in the nature of (or similar to) taxes, payable to any federal, state, provincial, local or foreign taxing authority, including, without limitation, (i) income, franchise, profits, gross receipts, intangibles, ad valorem, net worth, value added, sales, use, customs duties, service, real or personal property, escheat, unclaimed property, special assessments, capital stock, license, payroll, withholding, employment, social security (or similar, including FICA), workers' compensation, unemployment compensation, disability, utility, severance, production, excise, stamp, occupation, environmental, premiums, windfall profits, transfer, registration and gains taxes and (ii) interest, penalties, additional taxes (in each case, whether or not disputed) and additions to tax imposed with respect thereto; the foregoing shall include any transferee or secondary liability for a tax and any liability assumed by agreement (whether express or implied) or arising as a result of being (or ceasing to be) a member of any Affiliated Group or being included (or required to be included) in any Tax Return relating thereto (including pursuant to Treasury Regulation §1.1502-6 (or any analogous or similar state, local, or foreign Law)).

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement with respect to Taxes (including but not limited to statements, schedules and appendices, and other materials attached thereto, and including any amendment thereof) filed or required to be filed in connection with the determination, assessment or collection of any Taxes of any Person, or the administration of any law, regulation or administrative requirements relating to any Taxes with the IRS or any other Governmental Authority, domestic or foreign, including, without limitation, consolidated, combined and unitary tax returns.

"Trade Laws" means all Laws relating to imports, exports and economic sanctions, including all Laws administered and enforced by the U.S. Department of Commerce's Bureau of Industry and Security, the U.S. Department of State's Directorate of Defense Trade Controls, the U.S. Treasury Department's Office of Foreign Assets Control or equivalent Governmental Authority in a non-U.S. jurisdiction.

"Trade Secrets" means all inventions, processes, designs, formulae, trade secrets, know-how, ideas, research and development, data, databases and confidential information.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the Sale Approval Order and all other Contracts, instruments and certificates contemplated hereunder to be delivered by any party hereto at or prior to the Closing, including without limitation, each of the Exhibits to this Agreement.

"Transactions" has the meaning set forth in the recitals.

"Transfer Taxes" has the meaning set forth in Section 3.1(a).

"Trigger Event" means the occurrence of any of the following events: (i) any material breach of this Agreement by Seller; (ii) a Competing Bid approved by the Bankruptcy Court is consummated; (iii) the Seller transfers any part of the Purchased Assets other than to the Buyer (whether in or outside of Chapter 11 Case); (iv) the Seller fails to consummate the Transaction on or before the Outside Date other than as a result of any delay directly caused by Buyer (other than in connection with the Seller failing to satisfy a condition to closing set forth in Section 6.1 or being in breach of this Agreement); or (v) the Seller makes or allows changes to be made to the Sale Procedures Order, except for changes agreed in writing by the Buyer (which consent shall not unreasonably withheld).

"Unbilled Apportioned Obligation" has the meaning set forth in Section 3.1(b).

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act or any similar federal, state, or local law.

## ARTICLE X
## MISCELLANEOUS

10.1    Expenses.   Except as otherwise expressly provided herein (including in Section 7.9) , each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Transactions.

10.2    Press Releases and Public Announcements.   Seller shall not issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of Buyer; provided, however, that Seller may make any public disclosure it believes in good faith is required by applicable Law, in which case Seller shall advise Buyer prior to such disclosure.  Seller and Buyer will consult with each other concerning the means by which Seller's employees, customers, and suppliers and others having dealings with Seller will be informed of the contemplated transactions, and Buyer will have the right to be present for any such communication.

10.3    No Third-Party Beneficiaries.   Except as expressly set forth in this Agreement, this Agreement shall not confer any rights or remedies upon any Person other than the Parties hereto and their respective successors and permitted assigns.

10.4 <u>Notices</u>. All notices, Consents, waivers, deliveries under <u>Section 1.5</u>, and other communications ("<u>Notices</u>") under this Agreement must be in writing and will be deemed to have been duly given when (i) delivered by hand (against receipt), (ii) sent by telecopier or via email as a PDF attachment (with written confirmation of receipt), provided that a copy is contemporaneously mailed by registered mail, return receipt requested, (iii) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), or (iv) five (5) days after being sent by registered or certified mail, return receipt requested, in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may hereafter designate by similar Notice to the other party):

If to Seller:

Precision Swiss Products, Inc.
1911 Tarob Court
Milpitas, CA 95035
Attn: Norbert Kozar
Email: Norbert@precisionswiss.com

with a copy (which shall not constitute notice) to:

Kornfield, Nyberg, Bendes, Kuhner & Little, P.C
1970 Broadway, Suite 600
Oakland, California 94612
Attention: Chris D. Kuhner
Email: c.kuhner@kornfieldlaw.com

and

SC&H Group
910 Ridgebrook Road
Sparks Glencoe, MD 21152
Attention: Hank Waida
Email: hwaida@schgroup.com

If to Buyer:

BTX Precision LLC
c/o ERA Industries LLC
1800 Greenleaf Avenue
Elk Grove Village, Illinois 60007
Attention: Jonathan Michalczyk Email:
jmichalczyk@btxprecision.com

with copies to (which shall not constitute notice):

35

c/o L Squared Capital Partners
3434 Via Lido, Suite 300
Newport Beach, California 92663
Attn: Randall Hunt and Tyler Huez
Email: rhunt@lsquaredcap.com and thuez@lsquaredcap.com

Vedder Price P.C.
222 North LaSalle Street, Suite 2400
Chicago, IL 60601
Attn: Michael A. Nemeroff, Shelby E. Parnes and William W. Thorsness
Email: mnemeroff@vedderprice.com, sparnes@vedderprice.com and wthorsness@vedderprice.com

10.5    Further Assurances. The Parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transactions.

10.6    Amendments and Waivers. No amendment or waiver of any provision of this Agreement shall be valid unless in writing and signed by the party to be charged with such amendment or waiver. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.7    Entire Agreement. This Agreement supersedes all prior agreements between the Parties with respect to its subject matter, including that certain Letter of Intent, by and between ERA Parent LP and Seller dated as of May 22, 2024, as amended and as the same may be further amended, and constitutes (together with the other Transaction Documents and any other documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. The exhibits and schedules identified in and attached to this Agreement are incorporated herein by reference and shall be deemed as fully a part hereof as if set forth herein in full. In the event of any inconsistency between the statements in the body of this Agreement and those in the exhibits and schedules (other than an exception expressly set forth as such in the Disclosure Schedule with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

10.8    Assignments, Successors and No Third-Party Rights. Except as specifically provided elsewhere in this Agreement, no Party may assign any of its rights under this Agreement without the prior consent of the other Parties which will not be unreasonably withheld, except that Buyer may assign any of its rights or obligations under this Agreement to (i) any Affiliate of Buyer, (ii) any lender(s) or agent thereof providing all or any portion of the financing to Buyer, whether or not in connection with the consummation of this Agreement or (iii) any direct or indirect acquirer (or any Affiliate thereof) of substantially all or all of the assets of the or a majority of the equity of Buyer or its parent companies, regardless of the form of the transaction. For the avoidance of doubt, Buyer may designate an Affiliate to act as the purchaser of all or part of the

Purchased Assets hereunder without first obtaining the consent of Seller. Subject to the preceding two sentences, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the Parties. Except as expressly provided in <u>Article III</u> or <u>Article VI</u>, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

   10.9 <u>Severability</u>. Any term of this Agreement which would be invalid or unenforceable as written shall be deemed limited in scope and/or duration to the extent necessary to render it enforceable. The determination of any court that any provision is invalid or unenforceable shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity of the offending term or provision in any other situation or in any other jurisdiction.

   10.10 <u>Headings; Construction</u>.

   (a) The following provisions shall be applied where appropriate herein: (i) "herein," "hereby," "hereunder," "hereof" and other equivalent words shall refer to this Agreement as an entirety and not solely to the particular portion of this Agreement in which any such word is used; (ii) all definitions set forth herein shall be deemed applicable whether the words defined are used herein in the singular or the plural; (iii) wherever used herein, any pronoun or pronouns shall be deemed to include both the singular and plural and to cover all genders; (iv) all accounting terms not specifically defined herein shall be construed in accordance with GAAP; (v) neither this Agreement nor any other agreement, document or instrument referred to herein or executed and delivered in connection herewith shall be construed against any party as the principal draftsperson hereof or thereof; (vi) all references or citations in this Agreement to statutes or regulations or statutory or regulatory provisions shall generally be considered citations to such statutes, regulations or provisions as in effect on the date hereof, except that when the context otherwise requires, such references shall be considered citations to such statutes, regulations or provisions as in effect from time to time, including any successor statutes, regulations or provisions directly or indirectly superseding such statutes, regulations or provisions; (vii) any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or an Exhibit or Schedule to, this Agreement unless another agreement is specified; (viii) the Exhibits and Schedules attached hereto are incorporated herein by reference and shall be considered part of this Agreement; (ix) the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation" and shall not be limited by any enumeration or otherwise; (x) the symbol "$" and word "Dollars" shall mean dollars of the United States of America; (xi) the word "or" shall not be exclusive; and (xii) any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. In the event any item or notice is to be delivered hereunder on any day that is not a Business Day, the due date for delivery of such item or notice shall be deemed to be the next Business Day.

   (b) The Parties have participated jointly in the drafting of this Agreement, and each party was represented by counsel in the negotiation of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise

Case: 24-51678 Doc# 43 Filed: 11/14/24 Entered: 11/14/24 15:43:07 Page 48 of 51

favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.11 <u>Governing Law</u>.  This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "<u>Transaction Dispute</u>"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

10.12 <u>Dispute Resolution; Consent to Jurisdiction</u>. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby Consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.4</u>; <u>provided</u>, <u>however</u>, upon the closing of the Chapter 11 Case, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the District of Delaware or the Courts of the State of Delaware sitting in and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(a)  submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(b)  agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(c)  agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in <u>Section 10.4</u> of any process required by any such court, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(d)  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a

38

copy of this Section 10.12 with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

10.13   Counterparts; Facsimile.  Each of this Agreement and any other Transaction Document may be executed in several counterparts (including via PDF), each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument.  Signed counterparts of this Agreement or any other Transaction Document may be delivered by facsimile and by scanned PDF image, and the facsimile or scanned signature of any party shall be considered to have the same binding legal effect as an original signature.

10.14   Specific Performance.  The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the Transactions contemplated by this Agreement) in accordance with its specified terms or otherwise breach such provisions. Accordingly, the Parties hereto acknowledge and hereby agree that, subject to the terms of this Section 10.14, in the event of any breach or threatened breach by Seller, on the one hand, or Buyer, on the other hand, of any of their respective covenants or obligations set forth in this Agreement, Seller, on the one hand, and Buyer, on the other hand, shall be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by the other (as applicable), and to specifically enforce the terms and provisions of this Agreement to prevent or restrain breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other (as applicable) under this Agreement, without proof of actual damages or inadequacy of legal remedy and without bond or other security being required.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that (x) the party seeking the injunction, specific performance and other equitable relief has an adequate remedy at law or (y) an award of specific performance is not an appropriate remedy for any reason at law or equity.  The remedies available to a party pursuant to this Section 10.14 shall be in addition to any other remedy to which it is entitled at law or in equity, and the election to pursue an injunction or specific performance shall not restrict, impair or otherwise limit such party from seeking to obtain such other remedies.

**[SIGNATURE PAGE FOLLOW]**

39

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**BTX PRECISION LLC**

By: _____
Name:  Rick McIntyre
Title:   Chief Executive Officer

**SELLER:**

**PRECISION SWISS PRODUCTS, INC.**

By: _____
Name:  Norbert Kozar
Title:  President

for purposes of Section 3.5 hereof:

_____
Norbert Kozar

_____
Melissa Kozar

[Signature Page to Asset Purchase Agreement]